PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOAQUÍN MORALES ORAMA, Defendant and Appellant.

No. 4929.   Argued March 17, 1933.—Decided June 2, 1933.

186

*Celestino Iriarte* and *F. Fernández Cuyar* for appellant. *R. A. Gómez, Fiscal,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

This prosecution was instituted by the District Attorney of San Juan, upon an indictment found by the grand jury, charging Joaquín Morales Oroma, an Insular Police sergeant, with the crime of murder, as follows: " . . . on or about March 16, 1930, in Toa Alta, . . . . did unlawfully, wilfully, with malice aforethought and a firm, express, and deliberate intention to kill, and showing an abandoned and malignant heart, kill Antonio Vázquez Mojica, a human being, whom he assaulted and battered with a gun, inflicting on him several bullet wounds of a serious character, in consequence of which the said Antonio Vázquez Mojica died on March 16, 1930, in Toa Alta; and that the said wounds were inflicted by the defendant Joaquín Morales Orama, to the deceased Antonio Vázquez Mojica, with the intent to kill him, . . . "

The case was tried before a jury, which found the defendant guilty of voluntary manslaugther; and the court sentenced him to five years' imprisonment in the penitentiary at hard labor. Thereupon the defendant appealed, and he has assigned in his brief seven errors.

By the first assignment he maintains that the trial court erred in denying his second motion for a change of venue, and in accepting the return of the case by the District Court of Bayamón, to which it had previously transferred the same.

As we have said, the prosecution was commenced in the District Court of San Juan. The defendant appeared before that court and moved for a change of venue to the District Court of Bayamón, which had just been created, on the

187

ground that the witnesses resided within the territory of the new court. The District Attorney of San Juan consented and the court ordered the transfer of the cause.

At this stage, after the case had been filed in the District Court of Bayamón, the prosecuting attorney moved that court to declare itself without jurisdiction over the cause, and to return the same to the court in which it originated.

` The court entered an order accordingly, and stated in its opinion, which we quote below, the reasons for its action; and said opinion constitutes in itself the best argument that could be offered in support of the nonexistence of the error assigned. It says:

"Section 8 of the Code of Criminal Procedure provides:

" 'The jurisdiction of an offense shall be in the district court of the district where the offense has been committed.'

" *     *     *     *     *     *     *

"The general rule is that all offenses shall be tried in the district within which they were committed, except where the law expressly confers jurisdiction upon a court to try offenses committed outside its territory. *The People* v. *Ruiz*, 19 P.R.R. 90, 92.

"This Puerto Rican doctrine follows the American text writers. In 16 C. J. 185, section 260, we find:

" 'Generally speaking, it is a fundamental rule of criminal procedure that one who commits a crime is answerable therefor only in the jurisdiction where the crime is committed, and in all criminal prosecutions, in the absence of statutory provisions to the contrary, the venue must be laid in the county or district of the offense, and must be proved as laid.'

"Section 1 of Act No. 57 of 1930, creating the District Court of Bayamón, provides:

" ' . . . That the District Court of San Juan, as now constituted, shall have jurisdiction to continue to take cognizance of any . . . cause . . . civil or criminal, now pending before said District Court of San Juan, arising from any of the municipalities which hereby pass to the jurisdiction of the district court for the judicial district of Bayamón.'

"By virtue of these statutory provisions, the District Court of San Juan will have jurisdiction to continue to take cognizance of all criminal prosecutions pending on July 29, 1930, before that court

and arising from any municipality that is now part of the territory of the new district court.

"In 16 C. J. 197, section 296, it is said:

" 'Where the territory in which a crime is committed is created into a new county by the subdivision of the old county or otherwise, the courts of the new county have exclusive jurisdiction, unless the jurisdiction of the courts of the old county is continued by statute.'

"In the case of the *People* v. *Andrades*, 35 P.R.R. 404, attention was called to the above citation, and in the syllabus the same doctrine is stated as follows:

" 'When the territorial limits within which a crime is committed are included within the territorial limits of another district newly created, the court of the newly created district has exclusive jurisdiction of the crime unless the jurisdiction of the court of the old district is continued by the statute that reorganized said courts.'

"It was directed by Act No. 57 of 1930 that the District Court of San Juan should have jurisdiction of any criminal proceeding pending before it at the time the act was approved. The act, therefore, prescribed that the said court shall continue to have jurisdiction to take cognizance of such proceedings. This jurisdiction was not reserved for the new court, nor for any tribunal other than the District Court of San Juan.

"Jurisdiction is the power with which judges are vested to administer justice, and such power is derived directly from the law. *Ex parte Bou,* 7 P.R.R. 133. The court must have jurisdiction of the offense and of the person of the defendant. *Ex parte Thomas,* 12 P.R.R. 350. In order that jurisdiction may exist there must be present, among other requisites, the power on the part of the court to take cognizance of the matter submitted to it. *Ex parte Le Hardy,* 17 P.R.R. 1008.

"Jurisdiction over this case has not been conferred on the District Court of Bayamón by law, directly or immediately; on the contrary, it was so conferred on the District Court of San Juan. The Bayamón court has not been authorized to take cognizance of the matter. Such power was expressly granted by law to the San Juan court.

"There is not doubt, therefore, that the general rule set forth in section 8 of the Code of Criminal Procedure that jurisdiction of an offense shall be in the district court of the district where the offense has been committed, has an exception, to wit: where the law expressly confers jurisdiction upon another court; and that the District Court of San Juan, by express provision of the law, retained

jurisdiction over all criminal proceedings pending before it on July 29, 1930, when the District Court and the Judicial District of Bayamón were created.

"The claim that the defendant is entitled to be tried by a jury of the neighborhood, is not a constitutional right. The Sixth Amendment to the Constitution of the United States does not apply to Puerto Rico. *People of Porto Rico* v. *Tapia* and *People of Porto Rico* v. *Muratti*, 245 U. S. 639; *Balzac* v. *People of Porto Rico*, 258 U. S. 298. And the Jones Act contains no provision to that effect. Section 2 of our Organic Act guaranties to the accused the right to a speedy and public trial, but it says nothing expressly as to a jury or the district. In construing the said Organic Act it has been declared that Puerto Ricans have no right to demand a trial by jury, unless the Legislature deems it proper to accord it. *Balzac* v. *People, supra*.

"In Puerto Rico, trial by jury is a statutory privilege. By examining this statute, which is the Code of Criminal Procedure, it will be found that section 178 thereof provides that issues of fact in cases of felony shall be tried by a jury when the defendant so elects; and section 184 provides that a jury is a body of men selected from the citizens of a particular district with power to try questions of fact.

"There is no provision in the law which would indicate that a defendant who has committed a crime within the jurisdiction of a court must be tried by his neighbors, but by the men of a given district, that is to say, by those of the judicial district where the crime was committed. The law guaranties to the defendant a trial in the district where the offense was committed and before a jury selected from that same district, which means, inhabitants of the district where the crime took place.

"If the defendant is being prosecuted for an offense committed in Toa Alta, a matter over which the District Court of San Juan retains jurisdiction by express mandate of the law, as the crime was committed within its territorial limits and was pending before it on July 29, 1930, the men on whom it is incumbent to try the facts are those of the place wherein the criminal act was committed.

"The question of trying criminal cases in the proper district is a matter of public policy that affects, in the first instance, the state, the community at large. The proper district for holding the trial is the one that the law determines, and it can not be changed except in the specific cases authorized by law. Section 171 of the Code of Criminal Procedure prescribes those cases.

"In the instant case, the defendant requested a transfer of the cause to this court and it was granted because 'the crime with which he is charged was committed within its jurisdiction'. This attitude of the defendant, from which a submission might be inferred, is of no importance. It can not affect the jurisdictional question involved. In *People* v. *Paz*, 12 P.R.R. 98, 103, it was said:

" 'Section 8 of the Code of Criminal Procedure expressly states that "the jurisdiction of an offense shall be in the district court of the district where the offense has been committed."

" 'It is a general rule that in criminal matters the jurisdiction of an incompetent court cannot be extended, and this is why our Code of Criminal Procedure does neither recognize nor authorize the submission of the parties to the jurisdiction of a specific court, the reason being, no doubt, that in criminal matters the jurisdiction has been established, not only having in view the interest of the offenders and the offended, but also that of the community.

" '*    *    *    *    *    *    *

" 'In civil matters the litigants are the only parties interested, and they may, without any objection whatsoever, agree upon such admission, and against this authorized and lawful agreement, whereby no one is prejudiced, nobody may complain, but in criminal matters the interests to be looked after are distinct, and the principle of submission cannot be applied thereto.'

"The above doctrine is in accord with the one upheld by courts of the nation. In 16 C. J. 176, it is stated:

" 'Jurisdiction to take cognizance of an offense or to render a particular judgment can not be conferred upon a court by consent of accused, either express or inferential; where it has none by statute, as by failure to object, as jurisdiction of the subject matter must be conferred by law; but where a court has jurisdiction of the subject matter, jurisdiction of the person of the defendant may be conferred by consent or waiver; and a statute may authorize a court to try a criminal case by consent of parties.'

"Reasons of a general character that should be borne in mind in this connection are set forth in *Ex parte Thomas,* 12 P.R.R. 350; *Fajardo* v. *Soto Nussa,* 23 P.R.R. 71; *People* v. *Nogueras,* 23 P.R.R. 309; *People* v. *Rivera,* 30 P.R.R. 520.

" 'Where the proceedings in the court granting a change of venue are so irregular as to be wholly void, the court to which the case is taken acquires no jurisdiction, and the question may be raised at any time in the course of proceedings in that court.' 16 C. J. 221, sec. 339.

''The order giving rise to the present proceeding is wholly void. It amounts to investing this court with a new jurisdiction. The courts can not legislate; and the consent of the accused to such an order involves nothing more than a submission to an act which is void *per se*. We are not dealing here with a constitutional right which the accused might waive, but with the investing of a court with jurisdiction which the law does not confer and with the withdrawal from another court of jurisdiction expressly conferred upon it by law. In Puerto Rico, the law does not contemplate the grant of a change of venue in a criminal case on those grounds.

'' 'Jurisdiction to try and punish for a crime cannot be acquired otherwise than in the mode prescribed by law, and if it is not so acquired any judgment is a nullity.' 16 C. J. 176.

''In order that a change of venue may be legal, it must be authorized by law. The order providing for the transfer of this cause from San Juan to Bayamón is based on erroneous grounds. The reasons set forth in the order are insufficient. It violates Act No. 57 of 1930. And this court has nothing else to do but to retransfer the case to the District Court of San Juan.

''In the case of *People* v. *Díaz et al.*, 18 P. R.R. 878,884, in passing upon an order of the District Judge of Guayama which provided for the transfer of a certain case to Ponce, it was held:

'' 'The order made by him on May 4, 1911, was a nullity, and the judge had nothing else to do but to retransfer the case to the Guayama court, as he did properly and promptly according to law.' ''

The District Court of San Juan was entirely justified in denying the second motion for removal presented when the cause was filed again therein.

The second assignment of error reads as follows: ''The court erred in permitting Miguel Gandía, a friend of the deceased, to act as juror in spite of the defendant's challenge for cause.''

We have carefully studied the arguments of the appellant and of the Government, as well as the facts of the case, and inasmuch as the juror stated that his favorable disposition towards the deceased because of his previous acquaintance

with him and what he had read in the newspapers, had not led him to form a definite opinion; and that he would render his verdict in accordance with the evidence submitted, we are of the opinion that the court acted correctly in overruling the challenge. Nor does it appear that the accused had exhausted the peremptory challenges to which he was entitled. *People* v. *Cortés,* 42 P.R.R. 886, 888.

By the third assignment it is maintained that "the court erred in its instructions to the jury on the law of self-defense." In arguing this assignment in his brief the appellant says:

"The main theory of the defendant herein was that of self-defense.

"In regard to it the judge instructed the jury as follows:

" 'To justify a homicide on the ground of self-defense it is necessary for the defendant not only to believe, but also to have reasonable grounds for the belief, that when he killed his aggressor, he was in imminent and immediate danger of death or great bodily harm. The circumstances must have been such as to produce in the mind of a person of moderate prudence the conviction that he was in danger of death or great bodily injury. Reasonable fear does not mean the fear of a coward but that of a person of moderate courage.'

"Repeating this same theory it subsequently said:

" 'But this belief or fear should not be the fear of a coward, but that of a person of moderate courage and ordinary firmness.'

"It manifestly appears that by these instructions the judge, whether consciously or unconsciously, presented the accused to the jury as a coward, or at least made the insinuation to the triers of facts that the accused had taken the life of a subordinate through sheer cowardice."

We do not agree to the above contention. The law on the subject is set forth in section 210 of the Penal Code, as follows:

"Sec. 210. A bare fear of the commission of any (of) the offenses mentioned in subdivisions two and three of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient

to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.''

It is true that the statute does not textually say ''the fear of a coward,'' nor ''a person of moderate courage,'' but that the circumstances must be sufficient to ''excite the fears of a reasonable person''; but it is also true that in such a case a reasonable person is one of moderate courage, and not one who might be classed as a coward. The type of person that the lawmaker had in mind was the normal type, and to present such type and nothing else was the effect of the instruction given by the court.

Moreover, the paragraph above transcribed does not set forth the whole of the instruction given by the court. Two additional paragraphs complete it, and upon reading them it must be concluded that the court clearly and correctly instructed the jury on this point.

The fourth assignment of error is that the court erred in refusing to admit in evidence the threats to kill that were sought to be proved by the testimony of Eugenio Santoni.

It appears from the record that when this witness began to testify, the following occurred:

''Prosecuting Attorney: If I remember correctly, when the defense was presenting their theory of the case to the jury, they stated that the accused had no knowledge of said threats.—Attorney Martínez Nadal: Yes.—Prosecuting Attorney: That they were unknown to him?—Attorney Martínez Nadal: Yes, sir.''

The district attorney objected and the court ruled as follows:

''As it has not been proved that the defendant had knowledge of the statements of the deceased, nor that they were communicated to him; and as there is no allegation or evidence of self-defense, or of any hostile act of the deceased against the accused, and the evidence of the district attorney not being doubtful or equivocal as to who was the aggressor, nor has it been shown that said statements form part of the *res gestae,* the objection of the district attorney is sustained.''

In support of his assignment of error, the appellant invokes the jurisprudence summarized in 30 C. J. 191, 241, sections 419 and 477, partially as follows:

"It has also been held that where the evidence of the killing is wholly circumstantial, threats of deceased even if unknown to defendant are admissible in evidence as tending to show the inherent probabilities of the transaction irrespective of any question of self defense."

"*  *  *  *  *  *  *

"Thus in case the evidence leaves it doubtful as to whether or not deceased was the aggressor in the difficulty in which the killing occurred as claimed by defendant, evidence of threats of deceased against defendant, even though not communicated to him, tends to show deceased's animus toward defendant and bears on the probability of his having been the aggressor, and hence is admissible for this purpose. . ."

But in the same section 419, at page 191 of volume 30 of Corpus Juris, the general rule and other exceptions thereto are stated thus:

"Ordinarily in the absence of overt acts, threats upon the part of deceased against defendant or threats of a general nature are inadmissible. But threats by deceased against accused are admissible as part of the *res gestae* when they were made at the time of the act which they are supposed to characterize, and so harmonize with it as to constitute one transaction, provided such threats refer to accused. Whether such threats were communicated to defendant, or whether the threats were seriously made or not, if deceased did that which justified a reasonable belief on defendant's part that deceased intended to execute the threats, is immaterial. Such threats are also in explanation of a statement of defendant, shown by the prosecution, that he would have to kill deceased."

And preceding what was cited by the appellant, it is stated in 30 C. J. 241, sec. 477:

"It has been laid down as a general rule that threats of deceased against defendant are not admissible in evidence unless such threats were communicated to defendant before the homicide, but there are important modifications of this rule."

And further on:

". . . and evidence of uncommunicated threats is also admissible when accompanied by proof of threats which have been communicated to defendant, as such evidence corroborates the communicated threats and tends to establish the reality of the peril in which defendant considered himself to be at the time of the killing. Evidence of uncommunicated threats of deceased shortly before the killing, together with acts and conduct indicating an intention to put the threats into execution, may be admissible as part of the *res gestae*. Although it has been stated broadly that, when the issue of self-defense is presented, threats of deceased are admissible whether communicated or not, other authorities hold them inadmissible when not relevant for the purposes or under the conditions just stated."

Applying the above jurisprudence to the facts in the instant case, we conclude that the general rule controls, as said facts do not show the existence of any of the exceptions; and hence the court did not err in barring the evidence offered by the defendant.

When the incident occurred, the evidence for the prosecution had already been introduced, which, as summarized by the trial judge in his instructions to the jury, is as follows:

"The prosecuting attorney considers that we are dealing with a case of murder in the second degree, and the evidence introduced by him, which consists of the testimony of Dr. Blas C. Herrero, Dr. Manuel López del Valle, José Díaz González, Ramón Estrada, Nemesio Guardiola, Juan Hernández, Jr., and Juan R. Molina, has tended to show that on the night of March 15 or 16, 1930, in Toa Alta, P. R., while the deceased, Antonio Vázquez Mojica, I. P., was on duty in one of the streets of said town, Sergeant Joaquín Morales Orama (the defendant), who was his immediate superior, approached the policeman, and the latter saluted him and told him: 'All is well'; that Sergeant Morales told Policeman Vázquez: 'Come along with me,' and that both walked along the street leading to the Corozal Road, towards the cemetery; that a few moments afterward two shots were heard and also the words: 'Titilo, Titilo they are killing me, bless my God!; then the policeman was seen running, seemingly towards the cemetery, with his hands raised, while Sergeant Morales fired four shots at him; that the policeman dropped to the ground, dressed in his uniform, with a winter overcoat over it, and with

his club hanging from his right hand; that then the sergeant searched the policeman's clothes, pulled out his revolver, and fired four more shots towards the spot where the body of the officer lay; that Nemesio Guardiola (Titilo), who had come out of his house undressed when he heard the first two shots, told the sergeant not to fire any more shots at him, and that he saw when the sergeant placed the revolver on the ground near the policeman's right-hand, but that later he picked it up and put it into his pocket and he told Policeman Guardiola that he must testify because he could save him; that Juan Hernández, Jr., who also heard the shots and went to the place of the occurrence, testified that he yelled to the sergeant not to be a coward, not to kill him on the ground, and that he aided the policeman whom he heard groaning and lifted him up, reclining him on one of his thighs; that at said place the defendant admitted having killed the policeman; that the latter was then taken to the hospital in an automobile, in which the sergeant also rode, stopping in front of the house of Dr. Manuel López del Valle, who had gotten up from bed upon hearing the shots, and said doctor stated that the policeman was already dead, a fact which was verified later at the hospital, and that he had six bullet wounds; that the defendant delivered to Juan R. Molina two revolvers: one with six empty cartridges, which he stated was his, and another with four empty shells, which he stated belonged to the policeman; that the latter had his uniform coat on, and his overcoat buttoned, which was taken off on the operating table of the hospital, and that Dr. López del Valle did not find that the deceased had any smell of powder in his hands; that the defendant asked him to examine him, that he examined him, but found no lesions; that on the next day, at about nine o'clock in the morning, Dr. Blas C. Herrero performed an autopsy on the body of officer Vázquez Mojica and found two bullet wounds of entrance and two of exit in his back, and that these wounds were nonmortal; that he also had two bullet wounds in his chest, necessarily mortal, without orifices of exit, which injured vital organs of the body, such as the lungs, the heart, the aorta, the esophagus, the liver, the spleen, and which caused his death from an internal hemorrhage.''

The fifth assignment of error is ''that the court erred in refusing to admit certain documents from General Police Headquarters relating to the deceased and tending to show the motive the deceased might have had for attacking the defendant.''

What was sought to be introduced in evidence was the record of an investigation made in the General Headquarters of the Insular Police, respecting certain charges brought by the defendant against the deceased for neglect of duty and disobedience of orders.

The rejection of such evidence was imperative. There were involved statements and documents pertaining to a distinct case. The Government was entitled to cross-examine the witnesses, and if the papers relating to said investigation had been admitted, the prosecution would have been deprived of such right.

It might perhaps be advisable to add with respect to this assignment of error and the preceding one, that in spite of the court's refusals, evidence concerning the threats was heard by the jury.

At page 135 of the transcript there appears the testimony of the witness Eugenio Santoni, thus:

"That another day when he was leaving the office, he met the deceased, and that although he does not remember the date, he knows it was three or four days before his reading in the 'Imparcial' the news of the tragedy; that he spoke on that occasion with Officer Vázquez, and that the latter told him that the sergeant had brought charges against him which were to be heard on that day, and that judging from their character he was going to lose his job and that his family would be left without bread, but that the sergeant would not eat much more of this because if he failed to be exonerated, and it was necessary, he was ready to kill the sergeant. He further stated that he had not told this to the sergeant because he had not seen him again."

At page 137, the witness Mariano Velilla testified:

". . . that Officer Vázquez spoke with the witness on that day and on different occasions; that he said that if he should be found guilty of the charge, he would kill the sergeant."

And at page 139, the witness Secundino Díaz stated:

". . . that he knews Joaquín Morales Orama and knew Officer Antonio Vázquez Mojica; that on the 15th of March of last year, he

was discharging the office of Mayor of Toa Alta; that on that day he was in the town, and that he remembers having spoken on the eve of the 15th of March with Officer Mojica while the latter was on duty that night; and that the conversation he had with the policeman was as follows: That when he was walking home to retire he passed near the policeman and the latter called him and told him: 'I have seen the sergeant go across the street and if he comes to investigate me tonight, I'll shoot him'; that the officer was wearing an overcoat inside of which he carried a revolver that he showed to the witness; that that was what he told him on the night before the officer died.''

Other similar statements appear of record.

By the sixth assignment of error the court is charged with having acted with passion, prejudice, and partiality during the course of the trial. The error is nonexistent. All the rights granted by law to the defendant were accorded to him, and his able attorneys invoked such rights to the limit. Really, he has no cause for complaint. The verdict of the jury—manslaughter instead of murder—and the sentence imposed by the judge—five years' imprisonment in the penitentiary, when ten could have been imposed—favored him.

The last assignment charges error on the part of the court in instructing the jury on the question of reasonable doubt. There is no merit in this assignment. The instruction complained of is as follows:

''The guilt of of the accused should be proved to the satisfaction of the jury, beyond a reasonable doubt, and in case a reasonable doubt exists he should be acquitted.

''There exists a reasonable doubt where after a careful examination, study, and comparison of all the evidence, the minds of the jury are so perplexed that they can not state that they have a firm conviction of the truthfulness of the charge brought against the defendant. This does not mean that every possible doubt must be destroyed, nor that the guilt of the accused must be shown with mathematical certainty, but that the evidence must produce that moral certainty which convinces and directs the mind, and satisfies the reason. It should not be, therefore, an imaginary or speculative doubt. The doubt that justifies an acquittal should not only be reasonable,

but should arise from a careful and impartial consideration of all the evidence in the case, or from the lack of evidence in support of the accusation.

"In criminal cases, the law presumes the defendant innocent until the contrary is satisfactorily shown by competent evidence, and it is the general rule that his guilt must be fully proved. This presumption of innocence accompanies the accused throughout the trial and the jury must keep it in mind during their deliberations."

The judgment appealed from should be affirmed.